Filed 12/30/13  P. v. Torrence CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)


| | |
|---|---|
| THE PEOPLE, | C066438 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F02976) |
| v. | |
| ANTOINE RICHARD TORRENCE, | |
| Defendant and Appellant. | |


Defendant Antoine Richard Torrence was charged with and convicted of attempted premeditated murder.  The jury found true allegations that defendant:  (1) committed the offense for the benefit of, at the direction of, and in association with a criminal street gang; and (2) a principal in the offense intentionally and personally discharged and personally used a firearm proximately causing great bodily injury.  The trial court sentenced defendant to a term of 15 years to life for the attempted murder, to run concurrently with a 25-year-to-life sentence for the firearm enhancement.

Defendant argues the trial court erred in giving several jury instructions.  He argues that the aiding and abetting instructions were incorrect, the gang enhancement instruction was incorrect, the gang-related firearm enhancement instruction was incorrect,

1

and that the court should have sua sponte instructed on the lesser included offense of voluntary manslaughter. He also argues the trial court erred in allowing a video to be introduced without a transcript, and that there was no substantial evidence of an intent to kill or of willful deliberation or premeditation, thus no substantial evidence of attempted murder. We find no merit in any of defendant's claims.

Both sides raise sentencing error, and we agree with defendant that the sentence for count one should be seven years to life, and with the People that defendant's 25 years to life sentence must be consecutive, rather than concurrent. We shall order a seven years to life sentence, and a consecutive 25 years to life enhancement. We shall otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The victim, Christopher Gaines, was in custody at the time of trial and testified pursuant to an agreement. Under the terms of the agreement, in exchange for his testimony he pleaded guilty to two charges, one charge was dismissed, and he would be sentenced to no more than seven years in prison.

Defendant and the victim were cousins. Defendant telephoned Gaines on the day of the shooting and told him he wanted to meet at their grandmother's house to give Gaines a gun that belonged to Gaines's cousin. Gaines testified that on the day of the shooting he was at his and defendant's grandmother's house, when he got into an argument with his grandmother. Gaines left his grandmother's house and went to a park. While he was at the park, defendant called him. It was unusual for defendant to call Gaines because Gaines had stopped associating with defendant after Gaines snitched on defendant about a robbery. Defendant told Gaines he wanted to meet him at the park. Gaines went to a nearby church and hid near some bushes to watch for defendant. Defendant arrived at the park with two other men. Gaines recognized the other two people as codefendants Joshua Matthews and Reginald Shamberger. Defendant was a member of the BAY gang, which stands for Bad Ass Youngsters. It is a part of the Starz

2

gang. Gaines testified that Matthews was a Starz gang member. Gaines did not think Shamberger was a member of a gang.

As Gaines walked up to the three he saw defendant pass a revolver to Matthews. Gaines had seen defendant with the same gun a few days earlier. Defendant started accusing Gaines of beating up their grandmother and disrespecting her. When defendant tried to grab Gaines, Gaines started to run out of the park. Gaines heard defendant say "get that nigga" or "shoot that nigger" and the gun went off, shooting Gaines in the leg and finger.

Gaines ran about 10 more feet, then fell to his knees. While Gaines was down, defendant ran up to him and asked "who shot you?" Gaines told him "you already know who did . . . ." Gaines said defendant took a swing at him, but he got up and ran away.

Gaines saw a fire truck. He ran to the truck and told it to stop. They administered to his injury for about 20 minutes before the police came and he was taken to the hospital.

One of the firefighters testified that they saw a man lying in the street near the bike lane, and thought there had been a car accident. Another man was standing over him. When they shone their spotlight, the standing man looked at them, then ran off. Gaines ran to the fire truck, saying that his cousin shot him because he snitched on his cousin.

Two other witnesses testified that they saw the shooting. Adelayda Perez and Beatriz Perez were at the park that evening. Adelayda saw the victim on his cell phone on one of the park benches. Although she could not hear what he was saying, she could hear that he was arguing. She saw him walk away toward the church. Later the three suspects were in the park and one of them was on a cell phone. The suspect on the cell phone used the word "blood" a lot. The victim then came back from the direction he had left. He was also talking on his cell phone. Both hung up their phones and they started yelling at each other. She saw one of the suspects pull out a gun and shoot the victim. It was not the same person who had been on the cell phone. When the victim fell down,

3

one of the suspects ran to him and began hitting him in his leg. The other two suspects ran when the fire truck came.

Beatriz Perez, the other witness, told essentially the same account. She also testified that the suspects seemed to be trying to get the victim to come closer because the suspect on the phone kept telling him that it was okay, that they had his back, that everything was going to be all right, and to come over so they could talk about it.

When interviewed by authorities, defendant admitted being a Blood gang member. At first, he claimed not to know much about the shooting of his cousin. When he was told Gaines had implicated him in the shooting, defendant's story changed. He admitted meeting Gaines in the park, but said that "some dudes" came out and started shooting at them. When the investigator told defendant that Gaines said defendant had been at the park with two other guys, defendant changed his story again and admitted he went to the park with his friend Josh (Matthews). He claimed Matthews and Gaines did not like each other, and that Matthews "and them" came up from behind him when he was talking to Gaines and started shooting. He claimed to have been shocked by the whole thing. He also claimed not to have been angry that Gaines had snitched on him earlier. When confronted by Gaines's statement, defendant denied passing a gun to Matthews and denied saying "shoot that nigga." He claimed Matthews shot Gaines because Gaines was a snitch.

Investigator Scott MacLafferty testified as a gang expert. He opined that the G-MOBB and Starz are really two criminal street gangs in Sacramento. BAY Starz operates under the G-MOBB umbrella. MacLafferty testified that the primary activities of the G-MOBB and Starz gangs are assault with a deadly weapon, murder, attempted murder, robbery, burglary, and felony weapons violations. MacLafferty stated his opinion that defendant, Matthews, and Shamberger were all G-MOBB Starz members.

4

MacLafferty further expressed the opinion that the shooting was committed in association with the G-MOBB Starz gang, and that it benefited the gang because it instilled fear and intimidation in the community and built respect for the gang.

All three codefendants were tried in a single trial, but with two juries. One jury was for Matthews, and the other was for defendant and Shamberger.

## DISCUSSION

### I
### Claims of Instructional Error

A. Aiding and Abetting Instructions

The trial court gave the following instructions on aiding and abetting:

"A person may be guilty of a crime in two ways: One, he or she may have directly committed the crime, I will call that person the perpetrator.

"Two, he or she may have aided and abetted a perpetrator who directly committed the crime.

"A person is equally guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. [CALCRIM No. 400.]

"To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that

"One, the perpetrator committed the crime;

"Two, the defendant knew that the perpetrator intended to commit the crime;

"Three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"And four, the defendant's words or conduct, in fact, aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to, and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

5

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [CALCRIM No. 401.]"

The trial court also instructed a defendant could be guilty of attempted murder as an aider and abettor if the defendant were guilty of attempted battery, and under the circumstances attempted murder was a natural and probable consequence of the attempted battery.

1. CALCRIM No. 400

Defendant argues that CALCRIM No. 400 erroneously instructed that an aider and abettor and perpetrator are "equally guilty."[1] Defendant cites *People v. McCoy* (2001) 25 Cal.4th 1111 (*McCoy*), which held that an aider and abettor may be guilty of a more serious crime than the perpetrator if mitigating factors exist which apply only to the perpetrator. *McCoy* stated, "[a]ider and abettor liability is premised on the combined acts of all the principals, but on the aider and abettor's own mens rea. If the mens rea of the aider and abettor is more culpable than the actual perpetrator's, the aider and abettor may be guilty of a more serious crime than the actual perpetrator." (*Id.* at p. 1120.)

Following the reasoning in *McCoy*, one appellate court has held that an aider and abettor may also be less guilty than the direct perpetrator. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164; *People v. Nero* (2010) 181 Cal.App.4th 504, 518-520.) Defendant argues that the jury, if properly instructed, could have found him less guilty than Matthews, and that the instruction violated his right to due process because it relieved the prosecution of its obligation to prove the necessary element of his mental

_____

[1] Defendant did not object to the instruction at trial. The People contend that any claim of instructional error was waived. However, because defendant makes the alternate claim that his trial counsel's failure to object amounted to ineffective assistance of counsel, we will address all the issues on the merits. (*People v. Williams* (1998) 61 Cal.App.4th 649, 657.) We do not directly address defendant's claim of ineffective assistance of counsel, because we find no substantive merit to his claims.

state as an aider and abettor, and violated his federal Sixth Amendment right to have a jury determine whether his state of mind was adequately proven. This argument exhibits a misunderstanding of the law and the instruction.

As previously stated, CALCRIM No. 400 as given in this case told the jury that a person could be guilty of a crime either as the direct perpetrator, or as an aider and abettor. The instruction also stated, "A person is equally guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." This part of the instruction actually conveys to the jury that if it finds the defendant was an aider and abettor, then the defendant is guilty of the crime *as if he had been the perpetrator*. The instruction does not, as defendant suggests, tell the jury that the aider and abettor must be found guilty of the same offense as the perpetrator, regardless of the aider and abettor's mental state.

In fact, the other instructions (CALCRIM Nos. 251, 401, & 600) make clear that unless the aider and abettor knows that the perpetrator intends to commit the crime (murder, in this case) and the aider and abettor intends to aid in the commission of the crime, he has no guilt as an aider and abettor. As *McCoy* explained, "when guilt is *not* predicated on the natural and probable consequences doctrine, the aider and abettor must, indeed, share the actual perpetrator's intent." (*McCoy, supra*, 25 Cal.4th at p. 1118, fn. 1.)

We may assume that the jury followed the instruction and found the defendant knew Matthews intended to commit murder and intended to aid and abet Matthews in the perpetration of the crime. Having made those findings, the jury correctly found defendant equally guilty of attempted murder, as though he had pulled the trigger himself.[2]

_____

[2] The jury was also instructed on a natural and probable consequences theory of aider and abettor liability, under which theory the aider and abettor is always as guilty as the

7

The trial court did not err in giving CALCRIM No. 400 with the "equally guilty" language.

2. Natural and Probable Consequences Theory

Defendant claims three other instructional errors. All are based upon the assumption that the jury found him guilty of attempted murder on the theory that he intended to aid and abet a battery, but an attempted murder was the natural and probable consequence of the battery. Any error in the instructions given was harmless beyond a reasonable doubt because the jury necessarily found defendant intended to kill Gaines, and did not resort to a natural and probable consequences theory of the crime.

a. Defendant argues that the trial court failed to instruct on some elements of attempted battery. The court gave admittedly confusing instruction on attempted battery. It informed the jury:

> "Before you may decide whether a defendant is guilty of attempted murder, you must decide whether he was guilty of attempted battery.
>
> "To prove that a defendant is guilty of attempted murder, the People must prove that the defendant is guilty of attempted battery.
>
> "During the commission of the attempted battery, a co-participant in that attempted battery committed a crime of attempted murder, and under all the circumstances, a reasonable person in the defendant's position would have known that the commission of the attempted murder was a natural and probable consequence in the commission of the attempted battery. [¶] . . . [¶]
>
> " . . . If the attempted murder was committed for a reason independent of the common plan to commit the attempted battery, then the commission of attempted murder was not a natural and probable consequence of attempted battery. [¶] . . . [¶]

perpetrator. (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 852.) However, the prosecutor told the jury this theory applied to Shamberger, but did not apply to defendant.

8

"If you decide that the defendant aided and abetted one of these crimes and that attempted murder was a natural and probable consequence of that crime, the defendant is guilty of attempted murder.

"You do not need to agree about which of these crimes the defendant aided and abetted.

"Attempt is defined as follows: A direct step requires more than merely planning or preparing to commit battery or obtaining or arranging for something needed to commit battery.

"A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action.

"A direct step indicates a definite and unambiguous intent to commit battery. It is a direct movement towards the commission of the crime after preparations are made."

The attempted battery instruction was relevant only if the jury concluded defendant was guilty of murder as an aider and abettor under a natural and probable consequences doctrine. In other words, if defendant did not intend to murder Gaines, but only to commit battery when he told Matthews to shoot Gaines, defendant would nevertheless be guilty of attempted murder because it is a natural and probable consequence of attempted battery.

Defendant claims the instruction was erroneous because it did not inform the jury that the People were required to prove that he took a direct but ineffective step toward committing a battery and did not inform the jury that the People were required to prove he intended to commit battery. We conclude that even though the instruction was not a model of clarity, it was in this case harmless beyond a reasonable doubt.

The instructional error complained of is subject to a harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].

" '[A]n instructional error that improperly . . . omits an element of an offense . . . generally is not a structural defect in the trial mechanism that defies harmless error review and automatically requires reversal under the federal Constitution.' [Citation.] Instead, an erroneous instruction that omits an element of an offense is subject to harmless error analysis under

9

*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*Neder v. United States* (1999) 527 U.S. 1, 15, [144 L.Ed.2d 35, 119 S.Ct. 1827] (*Neder*); *People v. Prieto* (2003) 30 Cal.4th 226, 256 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)  In general, the *Chapman* test probes 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citations.]' (*Neder,* at pp. 15–16.)  The high court in *Neder* analogized instructional errors that arguably prevent the jury from finding an element of an offense to the erroneous admission or exclusion of evidence.  [Citation.]  In such cases, 'the harmless-error inquiry must be essentially the same: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' [Citation.]"  (*People v. Gonzalez* (2012) 54 Cal.4th 643, 662-663.)

The record proves beyond a reasonable doubt that the jury did not rely on the natural and probable consequences theory to convict defendant as an aider and abettor of attempted murder.  The jury was given aiding and abetting instructions for the crime of attempted murder both on a theory that the aider and abettor intended to aid and abet murder and that the aider and abettor intended to aid and abet battery, and that attempted murder was a natural and probable consequence of the battery.  However, the prosecutor explained to the jury that the natural and probable consequences theory was applicable only to codefendant, Shamberger.

Furthermore, the trial court instructed that if the jury found defendant guilty of attempted murder, it must decide whether the "attempted murder was done willfully and with deliberation and premeditation."  The court instructed that defendant acted willfully "if [he] intended to kill when [he] acted."  The court instructed that defendant "deliberated in that [he] carefully weighed the considerations for or against [his] choice and knowing the consequences decided to kill."  The court instructed that defendant "premeditated if [he] decided to kill before acting."  The instructions also stated:  "The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated.  [¶]  The amount of time required for deliberations and premeditation may vary from person to person and

10

according to the circumstances. [¶] A decision to kill made rationally, [*sic*] impulsively or without careful consideration of the choice and its consequences is not deliberate and premeditated. [¶] . . . [¶] The People have the burden of proving this allegation beyond a reasonable doubt."

The prosecutor further explained that if the jury found the defendants guilty of aiding and abetting an attempted murder, then it would have to make a finding of whether the attempted murder was deliberate and premeditated. The prosecutor explained that this instruction did not apply to Shamberger, whose guilt depended on a natural and probable consequences doctrine.

The jury found true the allegation that defendant committed the attempted murder willfully, deliberately, and with premeditation. Pursuant to the instructions given to the jury, this means the jury found defendant acted with the intent to kill Gaines. Consequently, the jury found defendant guilty of attempted murder as an aider and abettor without employing the natural and probable consequences doctrine. Any error in failing to instruct correctly on attempted battery was thus harmless beyond a reasonable doubt.

b. Defendant argues the trial court erred in failing to instruct the jury that if it found defendant guilty of attempted murder under a natural and probable consequences theory, it was required to find that premeditated attempted murder (rather than simple murder) was a natural and probable consequence of attempted battery.

We need not consider whether the trial court erred because if there was any error it was necessarily harmless beyond a reasonable doubt. As indicated, the prosecutor told the jury that the natural and probable consequences theory of liability was not applicable to defendant. Furthermore, under the instructions given in the case, the jury found defendant acted with a willful intent to kill, made a deliberate decision to kill, and decided to kill before acting. Thus, the jury necessarily found that when defendant aided and abetted Mathews, his intent was to kill Gaines, not to aid and abet a battery.

11

c. Defendant argues the trial court should have instructed the jury that under the natural and probable consequences theory it could convict him of assault with a deadly weapon instead of attempted murder because assault with a deadly weapon is a natural and probable consequence of attempted battery. The jury was instructed on the lesser offense of assault with a deadly weapon, but was not instructed on its applicability under the natural and probable consequences doctrine.

As previously explained, the jury necessarily found defendant guilty on the theory that he intended to aid and abet Mathews in killing Gaines, thus any error in failing to properly instruct on a theory of natural and probable consequences was harmless error.

## II
## No Voluntary Manslaughter Instruction Was Required

Defendant argues the trial court erred in failing to give an instruction on voluntary manslaughter as an included offense.

"[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*Ibid*.)

Voluntary manslaughter is a lesser included offense of murder if malice is negated by a sudden quarrel or heat of passion, or by an unreasonable but good faith belief in the necessity of self-defense. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.) Self-defense is not at issue in this case, but defendant argues he was entitled to a voluntary

12

manslaughter instruction because the jury could have found a sudden quarrel or heat of passion provoked the shooting.

Defendant argues the eyewitnesses reported that he was angry before the shooting, and that Gaines testified defendant was angry because he believed Gaines had beaten up their grandmother.

The sudden quarrel or heat of passion required for voluntary manslaughter must occur " ' "suddenly as a response to the provocation, and not belatedly as revenge or punishment. Hence, the rule is that, if sufficient time has ela[ps]ed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." [Citation.]' " (*People v. Hach* (2009) 176 Cal.App.4th 1450, 1458.)

There was not substantial evidence here from which a reasonable jury could conclude that defendant was guilty of only attempted voluntary manslaughter, but not of attempted murder. There was evidence that the defendant and victim were yelling at each other in the park. The victim testified that defendant was yelling at him because defendant thought he disrespected their grandmother and beat her up. Gaines's argument with the grandmother occurred approximately 15 minutes before he went to the park. There was testimony from both Gaines and a bystander that when defendant was at the park talking to Gaines on the phone, he was not angry. Gaines testified that defendant never sounded angry or said he was mad, just that he was going to meet Gaines in the park.

A bystander testified she heard defendant on his cell phone at the park. She overheard defendant telling Gaines that it was okay, that they had his back, and that everything was going to be all right. Defendant kept saying, "come over here and we'll talk about it." This period of rational calm after the incident that supposedly sparked the sudden heat of passion shows that the shooting was not the result of provocation, as opposed to revenge or punishment.

13

Additionally, the evidence indicated that the shooting was at least in part gang-related because Gaines had "snitched" on defendant. The jury found the gang-related enhancements true. Gaines testified that defendant was angry at him because Gaines disrespected their grandmother *and* because Gaines had snitched. Gaines testified that the first time he spoke with defendant on the day of the shooting was several hours before the incident with his grandmother, when defendant called Gaines and told him he wanted to meet at the grandmother's house to give Gaines a gun that belonged to Gaines's cousin. In the phone calls after the incident with the grandmother, defendant never mentioned anything about the grandmother.

The prosecutor questioned Gaines as to why Matthews and Shamberger would be involved in a dispute about the grandmother, to which Gaines replied, "People get jumped." Gaines admitted that he had talked to defendant since the shooting, and that they had probably talked about the shooting. Investigator MacLafferty testified that in his expert opinion the crime was gang-related because it was committed in association with the G-MOBB Starz gang and assisted or furthered criminal conduct by one or more of the gang members. He testified that Gaines might try to minimize the snitching motive for the attack because snitching is bad within the gang culture. He testified that if there were no history of Gaines being a snitch, his opinion would be that the shooting was not gang-related.[3]

The jury found true the allegation that defendant committed the crime of attempted murder "for the benefit of, at the direction of, or in association with a criminal street gang, to wit, G-MOBB/STARZ, with the specific intent to promote, further or assist in criminal conduct by said gang members . . . ." Thus, the jury found that the shooting was

_____

[3] Gaines implicated defendant in an earlier robbery on December 5, 2007.

14

motivated in part by an incident that occurred some six months earlier, indicating it was the result of deliberation and reflection.

There was no need for the trial court to instruct on the lesser offense of attempted voluntary manslaughter because there was no substantial evidence that the shooting was aroused by a sudden provocation sufficient to cause an ordinary person to act without due deliberation and reflection. (*People v. Breverman* (1998) 19 Cal.4th 142, 163.) If defendant was angry over Gaines's disrespect of their grandmother, his anger had cooled, as evidenced by his calm demeanor on the telephone. If defendant was angry over Gaines's history as a snitch, he had approximately six months to deliberate and reflect on the matter.

## III
## Gang Enhancement Instruction

Defendant claims the standard instruction given on the gang enhancement failed to define the elements of the predicate offenses.

The court instructed pursuant to CALCRIM No. 1401 as follows:

> "If you find a defendant guilty of the crime charged in Count 1 or the lesser offense of assault with a deadly weapon, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang.

> "To prove this allegation, the People must prove that: One, the defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang;

> "And two the defendant intended to assist, further, or promote criminal conduct by gang members.

> "A criminal street gang is any ongoing organization, association or a group of three or more persons, whether formal or informal, that has a common name, or common identifying sign or symbol, that has as one or more of its primary activities the commission of murder, attempted murder, unlawful possession of a firearm, assault with a deadly weapon, and whose

15

members, whether acting alone or together, engage in or have engaged in a pattern of criminal activity.

"In order to qualify as the primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act by one or more members who [happen] to be members of the group.

"A pattern of criminal activity as used here means the conviction of one or more of the following: Murder and prohibitive possession of a firearm.

"At least one of those crimes was committed after September 26th, 1988, the most recent crime occurred within three years of one of the earlier crimes, and the crimes were committed on separate occasions or were personally committed by two or more persons.

"The crimes, if any, that establish a pattern of criminal gang activity, need not be gang-related.

"The People need not prove that the defendant is an active or current member of the alleged criminal street gang.

"You may not find that there was a pattern of criminal gang activity unless all of you agree that two or more crimes that satisfy these requirements were committed, but you do not have to all agree on which crimes were committed.

"The People have the burden of proving each allegation beyond a reasonable doubt. If the [P]eople have not met this burden, you must find that the allegation has not been proved."

Defendant argues the instruction should have specified the elements of each criminal act enumerated as a primary activity of the gang and given the statutory citation for each crime. The jury instructions given specified that a gang must have as one of its primary activities the commission of murder, attempted murder, unlawful possession of a firearm, or assault with a deadly weapon. These are all crimes specified in Penal Code section 186.22, subdivision (e), and there was no requirement or necessity that the jury be instructed as to the specific code sections.

In this case the pattern of criminal gang activity was proven by the conviction of two or more of the offenses specified in the statute. The fact of the convictions was the

16

only fact that the prosecution was required to prove. It was unnecessary for the jury to be instructed as to the elements of these crimes, because another jury had already determined that the elements of the crimes had been proven.

Defendant also claims the instruction erred by telling the jury that a gang member had to have been convicted of only one or more of the specified crimes. However, the instruction stated that the jury had to agree that "two or more crimes that satisfy these requirements were committed . . . ." Two of the requisite crimes were proven. The jury was properly instructed.

## IV
## Video

The jury viewed a video clip found on a phone that was found in Shamberger's room. The video was introduced as support for Investigator MacLafferty's opinion that defendant was a gang member and involved in gang-related crimes. The sound and video were both of poor quality. The video showed defendant displaying two handguns. Because of defendant's heavy use of slang, the audio was virtually unintelligible.

Defense counsel objected based on a rule of court, that there was no transcript for the video.[4] The trial court overruled the objection, and Investigator MacLafferty testified that the video (which is less than 40 seconds in length) supported his opinion that defendant is a member of Starz.

Defendant now claims that the trial court abused its discretion pursuant to Evidence Code section 352 in admitting the video without a transcript. The trial court did not abuse its discretion in admitting the brief video.

---

[4] Defendant did not object on Evidence Code section 352 grounds. We nevertheless consider the issue because defendant has asserted ineffective assistance of trial counsel.

17

California Rules of Court, former rule 2.1040 provided that a party offering a sound and video recording into evidence offer a typewritten transcript of the recording, "[u]nless otherwise ordered by the trial judge . . . ."**5**

There was good cause for the trial judge to allow the video without a transcript -- a transcript would have been virtually impossible because the audio was unintelligible. There was no prejudicial error. Defendant asserts the video was prejudicial because it showed him with guns and spouting profanity, a situation that was likely to inflame the jury. We fail to see how providing a transcript would have remedied this. Most of the transcript would have read "unintelligible," the profanity would have been the only words capable of being transcribed, and the guns would still have been visible.

V

Sufficiency of Evidence of Attempted Murder

Defendant argues there was insufficient evidence that he or Matthews intended to kill Gaines, or to establish that the attempted murder was willful, deliberate, and premeditated. The argument lacks merit.

In reviewing a claim that the evidence is insufficient, we review the evidence in the light most favorable to the judgment to determine whether there is substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Carter* (2005) 36 Cal.4th 1114, 1156.) We presume the existence of every fact in support of the judgment that the jury could reasonably deduce from the evidence. (*Ibid*.)

An intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*People v. Avila* (2009) 46 Cal.4th 680, 701.) Here, there was evidence defendant had a motive to kill Gaines because Gaines had snitched on him. Defendant

---

**5** California Rules of Court, rule 2.1040 currently provides that no transcript is required if the trial judge orders that a transcript is not required for good cause.

18

arranged a meeting with Gaines in the park, overcoming any resistance Gaines might have about meeting defendant by not showing any anger and telling Gaines that everything would be okay.  Defendant brought a weapon to the meeting, and instructed one of his fellow gang members to shoot Gaines.

This provided sufficient evidence from which the jury could have inferred that defendant intended to kill Gaines, and that the attempted murder was willful, deliberate, and premeditated.

VI

Gang-Related Firearm Enhancement Instruction

In a supplemental brief and for the first time, defendant argues the instruction given on the gang-related firearm enhancement was incorrect.  The instruction given by the court was as follows:

> "If you find the defendant guilty of the crime charged in Count 1, and you find that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote, further or assist in any criminal conduct by gang members, you must then decide whether the People have proved the additional allegation that one of the principals *personally used or personally and intentionally discharged a firearm* during that crime and caused great bodily injury.

> "To prove this allegation, the People must prove that:  One, someone who was a principal in the crime *personally used or discharged a firearm* during the commission of the attempted murder crime listed in Penal Code section 12022.53 [subdivision] (a);

> "Two, the person intended to discharge the firearm;

> "And three, that person's act caused great bodily injury to another who was not an accomplice to the crime.

> "A person is a principal in a crime if he or she directly commits or attempts to commit the crime or if he or she aids and abets someone else who commits or attempts to commit the crime.

19

"A firearm is any device designed to be used as a weapon from which a projectile is discharged or expelled through a barrel by the force of an explosion or other form of combustion.

"A principal personally uses a firearm if he or she intentionally does any of the following: One, displays the firearm in a menacing manner; two, hits someone with a firearm; or three, fires the firearm.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"An act causes great bodily injury if the injury is direct, natural, and probable consequence of the act, and the injury would not have happened without the act.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing intervenes.

"In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

"The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (Italics added.)

Defendant argues that because the trial court failed to delete the words "personally used or" in the italicized portions of the instruction above, as is directed by the bench notes to the instruction, the jury was erroneously told that the prosecution need only prove that one of the principals personally used *or* personally and intentionally discharged a firearm.[6] He notes that mere personal use of a firearm under subdivision (b) of Penal Code section 12022.53 authorizes a 10-year term rather than the 25 years to life he was given under subdivision (d).

---

[6] The bench notes to CALCRIM No. 1402 state: "Do not give the bracketed definition of 'personally used' if the prosecution alleges intentional discharge or intentional discharge causing great bodily injury or death." (Bench Notes to CALCRIM No. 1402 (June 2007) p. 1155.)

There is no possibility the jury understood this instruction to mean it could find the enhancement true if the principal either used but did not discharge the firearm, or discharged the firearm unintentionally. The instruction told the jury that the elements it must find were that the principal used or discharged the firearm, that it was intentional, and that it caused great bodily injury. Use of the firearm was defined to include firing the firearm.

Additionally, there was no evidence that Matthews displayed the firearm, or hit Gaines with the firearm, but did not fire it. Therefore, there is no reasonable probability that the outcome would have been more favorable to defendant had the "personally used or" language been omitted. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) There was no prejudicial error.

## VII
## Sentencing Issues

Defendant argues for the first time in his supplemental brief that the trial court erred in imposing both an increased parole eligibility period pursuant to Penal Code section 186.22, subdivision (b)(5) and a concurrent 25-year-to-life term pursuant to Penal Code section 12022.53, subdivision (d).[7] Respondent agrees, and so do we.

Penal Code section 12022.53, subdivision (e)(2) prohibits the trial court from imposing a gang enhancement in addition to an enhancement imposed pursuant to Penal Code section 12022.53, where the defendant did not personally use or discharge a firearm. This includes the 15-year minimum parole eligibility period. (*People v. Brookfield* (2009) 47 Cal.4th 583, 592-595; *People v. Gonzalez* (2010) 180 Cal.App.4th 1420, 1424-1427.) The customary parole eligibility period of seven years pursuant to Penal Code section 3046 applies.

---

[7] The People argue, defendant concedes, and we conclude, *post*, that the terms should be consecutive.

The People argue that the concurrent sentence ordered for defendant's 25 years to life term on the Penal Code section 12022.53 enhancement was unauthorized, and that the trial court was required to impose a consecutive sentence. Defendant concedes the issue.

Penal Code section 12022.53, subdivision (d) requires the trial court to impose a consecutive sentence, and the trial court has no discretion to impose the 25 years to life term concurrently. (*People v. Em* (2009) 171 Cal.App.4th 964, 971.)

## DISPOSITION

The sentence is modified to reflect a seven-year-to-life base term for count one that is consecutive to the 25 years to life enhancement pursuant to Penal Code section 12022.53. The judgment is otherwise affirmed. The trial court shall prepare and forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.


                                                    BLEASE                    , Acting P. J.


We concur:


      ROBIE                    , J.


      BUTZ                    , J.